## In re FIBERGLASS INDUSTRIES, INC., F.G.I. Fibers, Inc., Homestead Place Corp., Northeast Fiberglass Industries of Amsterdam, New York, Debtors.

Bankruptcy Nos. 84–11231 to 84–11234.

United States Bankruptcy Court,
N.D. New York.

April 1, 1987.

Nolan & Heller, Albany, N.Y., for Dollar Dry Dock; Richard Weiner, David H. Wilder, of counsel.

De Graff, Foy, Conway, Holt-Harris & Mealey, Albany, N.Y., for debtors; John D. Rodgers, of counsel.

Gadsby & Hannah, Boston, Mass., for Cold Stream Corp.; Walter Wekstein, William Zucker, of counsel.

## MEMORANDUM–DECISION AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Fiberglass Industries, Inc. ("F.G.I."), the parent company and three wholly-owned subsidiaries of F.G.I.: F.G.I. Fibers, Inc. ("Fibers"), Northeast Fiberglass Industries of Amsterdam, New York, Inc. ("Northeast"), and Homestead Place Corp. ("Homestead"), (collectively referred to as "debtors") filed for relief pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978, as amended ("Code") on September 28, 1984. On December 31, 1985, the debtors filed with the Court a consolidated disclosure statement and proposed chapter 11 plan.

In response to the treatment of its asserted claim under the plan, Dollar Dry Dock Savings Bank ("Dollar" or "Bank") filed application for an order to show cause seeking, among other relief, to have the Court determine the value of its security under Code § 506(a), while reserving its right to make an election under § 1111(b) of the Code at a later date.[1]

The debtors by separate application under Code § 506(c) seek recovery from Dollar of certain expenditures alleged to be reasonable and necessary costs and expenses of preserving the Bank's collateral. While distinctly separate issues, the parties agreed to have the debtors' application heard at the same time as the Bank's requested valuation hearing.

Testimony was elicited at nine days of hearings concluding in July, 1986. The parties have submitted memoranda and a stipulation of facts, which together with the transcript of testimony and attendant exhibits, forms the basis for the Court's decision. This memorandum-decision sets forth the Court's findings and conclusions

---

1. If Dollar were to elect application of § 1111(b)(2), then its claim would be deemed secured to the full extent that it is allowed, thereby reversing the bifurcated treatment of an undersecured claim under § 506(a) wherein a claim is secured to the extent of the value of the collateral and unsecured for the balance of the allowed amount. 3 *Collier on Bankruptcy*, ¶ 506.04[1] (15th ed. 1986).

as permitted by Rule 52 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") made applicable to this proceeding by incorporation under Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Fed.R. Bankr.P.").

## BACKGROUND

The debtors are engaged in the production and sale of fiber glass strand and woven mat products. Fibers produces the raw fiber glass strand which is thereafter sold by F.G.I. or woven into various matted or chop products by Northeast or by Southwest Fiber Glass Industries, Inc., ("Southwest"), a subsidiary of F.G.I. that is not a Chapter 11 debtor. Homestead serves as the title owner to the land and building used for the weaving operation of Northeast. F.G.I. buys the goods produced by its subsidiaries at cost and resells the goods for profit to outside markets. The subsidiaries function as manufacturing divisions of F.G.I. rather than as independent profit centers.

F.G.I. decided to produce its own fiber glass strand in 1979. Construction of Fibers' glass strand production facility began in 1980 and production of raw fiber glass strand commenced in March of 1982. Previously, F.G.I. had purchased raw fiber glass strand for the weaving operations of its subsidiaries on the outside market. The facility cost in excess of 13.5 million dollars which was financed in part by a $12 million dollar loan from Dollar, 45% of which is guaranteed by the Economic Development Administration, 45% of which is guaranteed by the Farmers Home Administration, and by a $1.5 million UDAG grant administered

through the City of Amsterdam Industrial Development Agency ("AIDA"). The Fibers' facility, consisting of a railroad siding and a two-story 30,000 square foot building which houses a furnace for the melting of raw materials involved in the production of fiber glass strand and various equipment including winders, bushings and silos for the storage of fiber glass forming materials as well as office space, is located at the Edson Industrial Park in Amsterdam, New York. It sits on 20.62 acres owned of record by AIDA and leased to Fibers.

## DOLLAR'S COLLATERAL

As of the date of filing of the debtors' Chapter 11 proceeding, Dollar was owed $15,471,896.00. This debt is secured by the property ("collateral") specified in eight documents which are referred to in paragraphs 3(a) to (h) in the parties' stipulation, appended thereto and incorporated as part of the record before the Court.[2] The collateral consists essentially of a first lien on the personal property and fixtures of the Fibers' facility, an assignment of Fibers' rights under its lease agreement with AIDA, a pledge of 20 percent of Fibers' common stock, and an insurance assignment dated July 31, 1980. Dollar is also secured by mortgages on two separate parcels of land: the 20.62 acres upon which the Fibers' facility sits, and a second parcel of unimproved land also owned by AIDA in which the debtors have no interest. For purposes of determining the value of Dollar's security in the instant proceeding under Code § 506(a), however, the Court is solely concerned with property in which the debtors have an interest.

2. The parties have stipulated that the Bank's collateral is described in the following documents:

(a) Mortgage (Series A), between the City of Amsterdam Industrial Development Agency and Dollar Savings Bank of New York, dated August 1, 1980.

(b) Mortgage (Series B), between the City of Amsterdam Industrial Development Agency and Dollar Savings Bank of New York, dated August 1, 1980.

(c) Assignment of Leases (Series A), between the City of Amsterdam Industrial Development Agency, FGI Fibers, Inc. and Dollar Savings Bank of New York, dated August 1, 1980.

(d) Assignment of Leases (Series B), between the City of Amsterdam Industrial Development Agency, FGI Fibers, Inc. and Dollar Savings Bank of New York, dated August 1, 1980.

(e) Security Agreement—Series A, by and among City of Amsterdam Industrial Development Agency, FGI Fibers, Inc. and Dollar Savings Bank of New York, dated August 1, 1980.

(f) Security Agreement—Series B, by and among City of Amsterdam Industrial Development Agency, FGI Fibers, Inc. and Dollar Savings Bank of New York, dated August 1, 1980.

(g) Pledge Agreement between Fiber Glass Industries, Inc. and Dollar Savings Bank of New York, dated August 1, 1980.

(h) Insurance assignment dated July 31, 1980.

Upon motion filed by the Bank, the Court entered an order on May 29, 1985 effective June 28, 1985 which was consented to by the debtors vacating the automatic stay imposed by Code § 362 with regard to the collateral. The Bank has agreed to stay any further prosecution of a pending state court foreclosure action until the outcome of the present valuation proceeding.[3]

## VALUATION OF DOLLAR'S COLLATERAL

The debtors in their disclosure statement place a "liquidation" value of $607,000 on all the equipment located at the Fibers' facility. The debtors further estimate the value of the Fibers' building which is subject to the leasehold with AIDA to be worth $200,000. The debtors propose to pay the sum of these two figures, $807,000, to Dollar and the federal guarantors upon the effective date of the plan as payment in full of their secured claim.[4] The balance of the claim under the proposed plan is to be treated as unsecured to share pro rata in a distribution of $1,315,000 payable over a six year period.

At the valuation hearing, the debtors presented the testimony of Elias Cadan, principal of Associated Liquidators Company which provides auction, liquidation and appraisal services. At the request of F.G.I., Mr Cadan did an appraisal of the gross liquidation value of the equipment located at the Fibers' facility, as more particularly described in Exhibit "L". Mr. Cadan estimated the value of the equipment to be $607,000 if sold at public auction at distressed market prices. The debtors proffered testimony regarding two other methods of valuation: (1) replacement cost method, and (2) market data method.

While not contesting the value ascribed to its collateral in the event of a liquidation, Dollar takes the position that the figure is irrelevant in the instant proceeding as liquidation is not the appropriate method of valuing its collateral under the proposed program of the debtors. The Bank's valuation proof at trial was aimed exclusively in employing a going concern analysis of its collateral by use of a discounted cash flow method. Although admitting testimony relevant to liquidation, replacement cost and the market data method, the Court agrees with Dollar's position that a going concern analysis is the most appropriate method in evaluating the collateral under the given circumstances and plan proposed by the debtors.

The second sentence of Code § 506(a) offers the only express statutory guidance with respect to how to value a secured creditor's collateral:

Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The legislative history of Code § 506(a) makes it clear that no fixed approach to valuation is intended:

'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356 (1977), reprinted in 5 U.S. Code Cong. & Admin. News 5787 6312 (1978).

While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property.

S.Rep. No. 95–989, 95th Cong., 2nd Sess. 68 (1978), reprinted in 5 U.S. Code Cong. & Admin. News 5854 (1978).

■ Were the debtors contemplating an actual disposition of the collateral, valuation would be based upon the consideration

---

3. Absent the consent of both parties to have the present matter heard and decided, the Court might well be without jurisdiction to entertain the same.

4. No value is ascribed to Fibers' common stock 20% of which serves as additional collateral for the Dollar loan in light of the apparent insolvency of Fibers. The plan provides for cancellation of all stock.

that the estate would expect to receive therefor, assuming the consideration to be fair. 3 *Collier on Bankruptcy* ¶ 506.04[2] (15th ed. 1986). Where, as under the present plan, the debtors propose retention and continued use of the collateral, a forced-sale or liquidation value of the collateral is inappropriate. *Matter of QPL Components, Inc.*, 20 B.R. 342, 345 (Bankr. E.D.N.Y.1982). The essential inquiry is what "value"[5] does the collateral have to the estate. As was stated in *Matter of Crocket*, 3 B.R. 365, 367 (Bankr.N.D.Ill. 1980), with regard to valuing a secured claim under a Chapter 13 plan, but equally applicable to valuing Dollar's claim under the proposed Chapter 11 plan:

> Under a Chapter 13 plan the secured claim should be valued with due regard to the value of the property to the estate. '[T]he proposed disposition or use of such property' (Sec. 506(a)) in the instant case is for the debtors' retention and use. Therefore, the debtors cannot eat with the hounds and run with the hares. Seeking retention of the property, they cannot insist on liquidation values to be paid to the creditor ... The value of GMAC's secured claim under § 506(a) is enhanced by the continued use of the collateral in effectuating the debtors' performance under the plan, which value must be reflected in distributions under the plan.

Justice Douglas, in part quoting Justice Brandeis, stated:

> Value is a word of many meanings ... It gathers its meaning in a particular situation from the purpose for which a valuation is being made.

*Institutional Investors v. Chicago Milwaukee, St. Paul and Pacific Railroad Co.*, 318 U.S. 523, 540, 63 S.Ct. 727, 738, 87 L.Ed. 959, (1942) *reh'g denied*, 318 U.S. 803, 63 S.Ct. 980, 87 L.Ed. 1166 (1943). The principal purpose of the instant valuation is to assure fair compensation to Dollar which will be deprived of access to its security for recovery on its claim while the

debtors continue to use and enjoy the benefits derived therefrom. 3 *Collier on Bankruptcy* ¶ 506.04[2], (15th ed. 1986).

Since filing, the debtors have continued in possession of their assets and have continued to operate their business as debtors in possession pursuant to Code §§ 1107 and 1108. The debtors intend to continue in the business of producing, selling and distributing fiber glass products and to "continue to explore, with a view to expansion, the sale of raw fiber glass strand produced at the Fibers' facility to customers other than F.G.I." (Article XI at p. 59 first amended disclosure statement).

In the debtors' initial statement of assets and liabilities filed with the Court on November 16, 1984, the debtors valued Dollar's collateral at $14,369,031.00. The debtors attempt to explain in their disclosure statement the discrepancy between this figure and the $807,000.00 proposed plan payment by stating that the values contained in the initial statement, "were based on the assumption that the assets, if sold, would be so conveyed as part of a going concern and do not reflect anticipated liquidation values," (Article VI(B) at p. 37, first amended disclosure statement). The proffered explanation ignores the fact that the debtors intend to keep the business running as a going concern. As such, the Court will hold the debtors to a going concern standard with respect to valuing the collateral which they continue to use and retain.

## GOING CONCERN VALUE

Having concluded that a going concern analysis is the appropriate approach to valuing the collateral, the Court now turns to the proof adduced by Dollar. Dollar produced Richard Kelsey who is managing director of Standard Research Consultants ("SRC"), a division of American Appraisal Associates, Inc., which specializes in the evaluation of businesses and securities. At Dollar's request, SRC prepared a going concern valuation of Dollar's collateral

---

**5.** "Any reasonable method of ascertainment of value ... is permissible, the essential thing is to give the mortgagee the benefit of that value." *In the Matter of Witherbee Court Corp.*, 88 F.2d 251, 253 (2nd Cir.1937) as cited in Footnote 23, *Matter of Pine Gate Associates, Ltd.*, 3 B.C.D. 301 (N.D.GA.1977).

based upon a discounted cash flow analysis. The discounted cash flow analysis prepared by SRC was based upon Exhibit 5, a projected consolidated income statement for F.G.I. covering the period July 1, 1985 to March 2, 1990. Exhibit 5 had been prepared by John Menzel, chairman of the board of directors of F.G.I. and its subsidiaries, in October, 1985. Mr. Menzel reaffirmed the validity of the projections contained in Exhibit 5 as late as February 28, 1986, during the course of a Fed.R. Bankr.P. 2004 examination conducted by Dollar. (Record, May 7, 1986, pages 148–150).

The discounted cash flow analysis comprises essentially two parts: 1) taking cash flow projections for the years 1986 through 1991 and for a terminal year which represents a normalized projection for all years after 1991 and discounting them to present value; and, 2) selecting an appropriate discount rate which involves a calculation of the risk of actually obtaining a certain income stream and determining a rate of return suitable to the risks involved.

Exhibit 51, based upon the projections of the debtors' chairman John Menzel, and using a discount rate of 14 per cent, concludes that the value of the entire business enterprise of F.G.I. is $4,708,000. From this figure, SRC deducted estimated current working capital of $1,875,000 to arrive at a going concern value for the Bank's collateral and miscellaneous intangibles of F.G.I. of $3,503,000. The deduction for working capital, defined to include cash, accounts receivable, inventories, prepaid expenses and any other assets deemed "current assets", is made because the Bank's lien does not extend to the fore-

going. SRC attributes no value to miscellaneous intangibles of F.G.I., which include but are not limited to the value of an assembled work force, good will and management in arriving at a going concern value of $3,503,000 for Dollar's collateral.[6]

Exhibit 51 was the going concern analysis presented at the deposition of Mr. Kelsey which was conducted by counsel for Cold Stream Corporation, Inc. on April 4, 1986. As a result of certain questions raised regarding the effect of inflation and the choice of discount rate, SRC revised the figures reflected on Exhibit 51 and, accordingly, its conclusion as to value as reflected in Exhibit 52. Based upon the same projections utilized in Exhibit 51 with the exception of including in the average or terminal year a capital expenditure of $240,000, representing one-fifth[7] of the total projected cost of furnace refabrication adjusted for inflation, and use of a discount rate of 13.75% as determined in Exhibit 55, Exhibit 52 places a going concern value of $3,446,000 on the Bank's collateral and miscellaneous intangibles of F.G.I.. Dollar asserts, as stated previously, that there is no value to the miscellaneous intangibles of F.G.I. and that, accordingly, the $3,446,000 value is attributed solely to Dollar's collateral.

On or about April 21, 1986, after the commencement of the instant valuation proceeding, and Kelsey's deposition during which Kelsey analyzed the Exhibit 5 projections and concluded that they resulted in a going concern value for the collateral of $3,503,000, John Menzel prepared Exhibit Q, representing a revision of his Exhibit 5 projections. According to Menzel, the revision was prepared to reflect current market conditions for sales after Menzel had

---

**6.** The Court agrees that no value should be ascribed to the intangibles of F.G.I. The work force of F.G.I. is not highly skilled and the corporation operates in an area of high unemployment. There is clearly no basis to ascribe a value for "goodwill." "Goodwill is an intangible asset that attaches to a business as a result of such favorable factors as location, product superiority, reputation, and managerial skill ... evidenced by the ability of the business to earn a rate of return on the investment that is in excess of the normal rate for other firms in the same line of business." C. Niswonger & P. Fess, *Accounting Principles*, 257 (12th ed. 1977). It is a

generally recognized accounting principle that "goodwill" should be accorded a value only if it can be objectively determined by a specific event or transaction. *Id.*

The consolidated balance sheet of the debtors as of December 31, 1985 ascribes no value to intangibles of F.G.I. [Ex.5].

**7.** It is anticipated that refabrication of the furnace will be required every five years. Accordingly, its inclusion in the terminal year reflects the recurring nature of this capital expense.

the opportunity to review the debtors' in-house sales figures for January and February, 1986. John Menzel also prepared Exhibit P in an attempt to depict the depressing effect that the market has had on prices of products sold by F.G.I. over a sixteen month period.

On May 7, 1986 Menzel testified at trial: My previous projections projected sales going up a lot faster than this ... The sales came down and we ... I felt that sales would be not as good as before, and I feel also that the ... our costs will not drop down in proportion of sales.

The result is that for the year ending December, 1987, Exhibit Q projects a net loss of $386,835, in comparison to a projected loss for year ending March 2, 1987 on Exhibit 5 of only $23,211. For year ending December 31, 1990 Exhibit Q projects a net loss of $148,096, while Exhibit 5 projects net income for year ending March 2, 1990 of $232,830. It is obvious that were Kelsey to have utilized the revised Exhibit Q projections in his discounted cash flow valuation of the collateral, a substantially lower going concern value for the collateral would have resulted.[8]

Dollar alleges, however, that there is no basis for the revised projections, and chose not to utilize them in making its discounted cash flow analysis. In his testimony of May 21, 1986, Menzel amended his testimony concerning Exhibit P. He restated that rather than comprising 70% of the sales of F.G.I. for the test period April 1 to April 21, 1986, as was previously testified, the selected three products accounted for 31.3% or less than one third of overall sales for the period. He further testified that the preparation of Exhibit P did not involve an actual computation of data from all invoices for the subject periods.

Dollar did their own analysis of the sales prices of F.G.I. products with the assistance of Howard Foote, a certified public accountant with the accounting firm of Urbach, Kahn and Werlin (Exhibits 40–45). Upon examination of all of the sales invoic-es of F.G.I. for the months of July, 1985 and April, 1986, Foote analyzed sales of the selected products described in Exhibit P as well as sales of all categories of the products identified. For July, 1985 combined sales of the three selected products accounted for only 18.79% of total gross sales of F.G.I., and constituted 25.92% of total gross sales for the month of April, 1986. Comparison of the selected sales for the periods July, 1985 and April, 1986 reflected a drop in the weighted average unit selling price from .94 to .90. For the same periods, an analysis of the weighted average unit selling price for all categories of the products—Fab Mat, Woven Roving (other than Rovlok) and Yield Strand—reflected an increase of .05 per unit, from .87 to .92 per unit. Combined sales of all categories of the products accounted for 72.23 per cent of total gross sales of F.G.I. in July, 1985 and 84.32 per cent of total gross sales of F.G.I. for the month of April, 1986. Total gross sales of F.G.I. for the month of April, 1985 were $801,969.63 as compared to total gross sales for the month of April, 1986 of $840,134.71.

Dollar offers two additional going concern values of $4,322,000 and $5,062,000 for its collateral based upon assumptions concerning gross profit margin and gross sales projections.

The gross profit margin is determined by dividing gross profit by net sales. The gross profit margin contained in Exhibit 51 (and Exhibit 52) is 20.95 per cent, the same margin contained in Menzel's Exhibit 5 projections. A consolidated balance sheet of the debtors prepared by Panell, Kerr and Foster, certified public acountants, for the ten month period ending December 31, 1985, reflects a gross profit margin of 22.-80 per cent (Exhibit 3). Dollar urges that the past operating results of F.G.I. coupled with anticipated savings in both utility costs and use of raw materials in production following a furnace reline justify the expectation of a 22.80 per cent gross profit margin in the future. Exhibit 53 fixes the

---

8. Fibers' treasurer and secretary Robert Thompson, who has an accounting background, testified that he performed the calculations in the manner adopted by Kelsey using the revised Exhibit Q projections and arrived at a going concern value for Dollar's collateral of $385,000.

going concern value of the Bank's collateral at $4,322,000 based upon a 22.80 per cent gross profit margin.

For year ending March 2, 1985, F.G.I. had net sales of $9,111,691. Dollar relies upon testimony of Donald L. Willbrandt of Dunn and Bradstreet, as well as the testimony of Charles Barber, president and chief executive officer of F.G.I., stating that he may have given a $10,000,000 figure to Dunn and Bradstreet when asked what total projected annual sales of F.G.I. are, as a basis for substantiating projected annual sales at $10,000,000. Based upon a 22.80 per cent gross profit margin and projected annual sales of $10,000,000 Dollar places a $5,062,000 going concern value on Dollar's collateral as reflected in Exhibit 54.

In evaluating the discounted cash flow analysis performed by SRC on behalf of the Bank, the Court must weigh SRC's reliance upon the debtors' cash flow projections contained in Exhibit 5, as well as its choice of a 13.75 per cent discount rate.

Cash flow projections require an appraisal of many factors which cannot be reduced to a fixed formula. Since it involves an informed judgment as to future performance, "an estimate, as distinguished from mathematical certitude, is all that can be made." *Institutional Investors v. Chicago, Minneapolis St. Paul & Pacific Railroad Co., supra* 318 U.S. at 542, 63 S.Ct. at 739 *quoting Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941). The judgment, however, must take into account all facts relevant to future earning capacity including but not limited to the nature and condition of the properties, the past earnings record and all factors which tend to support or negate reliance upon the past earnings record as an appropriate index of future performance. *Id.,* 312 U.S. at 526, 61 S.Ct. at 685.

John Menzel, who prepared the projections upon which SRC's analysis is based, appeared to the Court to be an intelligent and astute businessman. He holds an undergraduate degree in electronic engineering, a law degree from Fordham University and an M.B.A. from Columbia University. Menzel, through his solely owned corporate entity, Cold Stream Corporation, Inc., acquired his interest in the debtors by assignment from David Gordon for $200,000 on August 13, 1985. Menzel's prior experience has included work in the securities field as well as workouts involving several other companies who are users of fiberglass products. Just prior to assuming control of the debtors, Menzel was chief executive officer of Bee Fiber Glass located in Fall River, Massachusetts. When Exhibit 5 was prepared, Menzel had been intimately involved with the debtors for two months, notwithstanding the fact that formal Court approval of the transfer between Gordon and Cold Stream Corporation was not obtained until October 31, 1985. As stated previously, after an additional four months of involvement with the debtors' operations, Menzel reaffirmed the validity of his projections in sworn testimony. (Record, May 7, 1986, pages 148–150).

█ Under the totality of circumstances and given the timing of Menzel's preparation of Exhibit Q, the Court finds Menzel's explanation as to the need to revise his earlier projections disingenuous. Furthermore, the thorough analysis of the pertinent data by the independent accounting firm hired by Dollar furnishes no basis to substantiate Menzel's newly-found insecurity as to the trustworthiness of his earlier projections. The Court, therefore, rejects the eleventh hour revision and accepts the debtors' projections as contained in Exhibit 5 as the most competent and reliable estimate of the debtors' future performance available. Accordingly, Dollar was justified in relying upon these figures in making its analysis. Finally, in developing its discounted cash flow projections, SRC has taken into consideration the badly worn condition of the furnace at an estimated repair cost of $1,000,000.00 and the recurring nature of the projected capital expense of a furnace reline every five years. This is reflected by including a capital expenditure in the amount of $520,000 for furnace refabrication in years 1987 and 1988 and

inclusion of $240,000 for the same item in the terminal year.

The selection of an appropriate discount rate involves weighing the cost of debt and cost of equity capital in a given investment proposal based upon the relative proportions of each. The calculation is reflected in the following formula:

Discount rate or weighted cost of capital ("Kw") = proportion of debt ("Pd") $\times$ cost of debt ("Kd") + proportion of equity ("Pe") $\times$ cost of equity ("Ke")

■ The proposed Chapter 11 program of the debtors provides for interest bearing debt ranging between 1.2 and 1.5 million dollars. The balance of the debt repayment is proposed to be made to various classes of creditors over time without interest. It is this latter group who are, in essence, financing the balance of the plan. Only one-half of the post-confirmation debt will be interest-bearing debt, resulting in the calculation of a discount rate in the same 13 to 14% range as utilized in Exhibit 52. The discount rate selected by SRC provides for a 30 per cent return to the equity investor. As reflected on Exhibit 55, the rate is calculated as follows:

$$Kw = (Pd)(Kd) + (Pe)(Ke)$$
$$Kw = (.67)(5.75) + (.33)(30.)$$
$$Kw = 3.85 + 9.9$$
$$Kw = 13.75\%$$

In light of the proposed Chapter 11 plan of the debtors, the selection of a 13.75% rate appears to be within the range of an appropriate discount rate.[9]

The debtors object that although the approach taken by SRC may be valid when valuing an entire business enterprise, it is not valid with respect to valuing Dollar's collateral which does not comprise a distinct business enterprise. The debtors argue that net profit from the sale of strand produced by Fibers constitutes only a small part of the present company's total profit, and that SRC made no deduction in its going concern evaluation for the parent company's customer base, goodwill, management or the equipment utilized in the Northeast weaving operation.

The debtors operate as an integrated entity, with the parent serving as the major profit center. The financials are prepared on a consolidated basis as was the amended disclosure statement and proposed plan. The strand produced by Fibers is not only sold directly by F.G.I. but is also woven into product that is sold at profit by the parent. Merely because the collateral cannot be operated as a going concern itself does not imply that an operational value to the debtors for the collateral in place under the proposed Chapter 11 program of the debtors cannot be derived.

As pointed out previously, SRC arrived at a going concern value of $3,446,000 for the Bank's collateral and miscellaneous intangibles by deducting the estimated value of current assets or working capital. The parent company's customer base is in the nature of an intangible asset. F.G.I.'s customer base is limited to those who can utilize a coarse fiber, such as that produced by Fibers. There is no basis to assign a value to F.G.I.'s customer base nor to any other intangibles of F.G.I.[10]

SRC's Richard Kelsey testified that after working capital is deducted from the going concern value for F.G.I., the remainder includes the value of Dollar's collateral and any intangibles as well as any other fixed assets that are involved.[11]

---

**9.** The Court parenthetically notes that while the debtors challenged SRC's reliance on the Exhibit 5 cash flow projections, the debtors did not specifically question the selection of the 13.75% discount rate. In fact, the only going concern analysis presented by the debtors, in rebuttal to Dollar's analysis is reflected on Debtors' Exhibit DD, which utilizes the revised Exhibit Q projections and a discount rate of 13.75 per cent.

As noted above, SRC did adjust the discount rate from 14 per cent to 13.75 per cent based upon questions raised by counsel for Cold Stream Corporation. The lowering of the discount rate resulted in a lowering of the going concern value from $4,503,000 to $3,446,000, a difference of $57,000.

**10.** See discussion in Footnote 6.

**11.** The Homestead real estate was the subject of a tax sale to the City of Amsterdam in May of 1984 and as of December 1, 1984, was subject to pre-petition tax and water arrearages in the approximate amount of $125,838. The real estate is estimated by the debtors to be worth $150,000 and is subject to a mortgage in favor of South

Northeast owns certain weaving looms and miscellaneous equipment. It seems reasonable to assume that as a fixed asset not encompassed by Dollar's lien, the equipment should be treated in the same fashion as working capital and its value deducted in the computation of going concern value for Dollar's collateral. The question remains what value should be assigned to the equipment.

The debtors have proposed in their amended plan a payment of $60,000 to satisfy a secured lien held against the equipment. The Court notes, however, that the debtors have also proposed in the same plan a payment to Dollar of $807,000 in full satisfaction of its lien. The debtors refer to the proposed plan payments as anticipated liquidation values as compared to "going concern" values placed on the assets in their initial schedules. The schedules value the equipment of Northeast at $342,244.

█ The Court adopts a value of $268,034 for the Northeast equipment, the allotted portion ascribed to the equipment in the total consolidated figure for property, plant and equipment appearing in the Panell, Kerr and Foster consolidated financial statement of the debtors as of December 31, 1985. Deducting $268,034 from $3,446,000, the Court adopts $3,177,966 as the going concern value for Dollar's collateral using a discounted cash flow approach. This approach is favored in the present instance over a net earnings approach to valuation given the magnitude of non-cash expenses for a manufacturing entity in the nature of F.G.I.

The Court rejects the two alternate going concern values offered by Dollar of $4,322,000 and $5,062,000 which are predicated on certain assumptions regarding the actual savings to be realized as a result of the Fibers' furnace reline and resulting impact on gross profit margin, and, projected sales figures to be achieved as being speculative and not adequately substantiated by the record made in this proceeding.

The primary purpose of this or any other Chapter 11—apart from a "liquidating 11"—is to revitalize an ailing debtor to enable it to continue forward into the future. The debtors' prospects for reorganization do not appear dim. It is only when a Chapter 11 fails that liquidation value becomes the ultimate test. The debtors will not be permitted to incorporate the collateral as part of their plan and not pay Dollar the appropriate value for the income-generating nature of the assets.

In assessing the other methods of valuation offered at the hearing, the testimony regarding replacement cost ranging from .25 to .63 per annual pound of production to build a hypothetical facility with the same functional utility of Fibers without taking into account the specific location of the Fibers' facility in Amsterdam, New York is of little help to the Court. The fact is that the collateral to be valued is in Amsterdam, New York and any replacement of the status quo would require building in the same proximate vicinity. From the record, the Court might just as easily assume that if it took 13.5 million to build the actual plant in 1980 to 1982, that it would cost at the least a comparable amount in 1987, which sum (less the cost of necessary repair to the furnace), bears little relevance to valuing the collateral under the present plan.

Even less assistance, however, is given by the testimony regarding market value. While it might be that within the fiber glass industry, the Omni facility in Chino, California is the most closely matched facility to that of the debtors, the timing and circumstances surrounding the sale of the Omni facility as well as the absence in the record of sufficient evidence establishing exactly what was transferred as part of the sale, makes the one "comparable" an unreliable index of value. The Court notes, as the debtors' testimony indicates, that there are no present buyers waiting in the wings to purchase the debtors' business, despite efforts to market the same. This factor, however, rather than supporting a value of

Shore Bank, that has an outstanding balance of $676,244. S.R.C. did not deduct any value for this asset in its computation of the value of

Dollar's collateral and the Court ascribes no value for the same.

not greater than $700,000 as the debtors urge, only underscores the conclusion that market data is an inappropriate method to value Dollar's collateral under Code § 506(a).

As stated above, the Court adopts a discounted cash flow approach in arriving at a going concern value for Dollar's collateral of $3,177,966.

## DEBTORS' APPLICATION FOR CODE SECTION 506(c) RECOVERY

The debtors seek to deduct from the value of Dollar's collateral $282,277 spent by the debtors since the inception of the Chapter 11 proceedings on bushing and furnace repairs as well as an additional sum of $280,200 for certain environmental equipment presently under contract by the debtors. The debtors argue that the foregoing expenditures fall within the provisions of Code § 506(c) which provides that a trustee or debtor

> may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving ... such property to the extent of any benefit to the holder of such claim.

In support of their application, the debtors produced Robert Thompson, treasurer of F.G.I., who testified to four categories of the expenditures under consideration. They are reflected in Exhibits "D", "E", "F", and "G".

Exhibit "D" is a confirmation by Interel Corporation of the debtors' purchase order for a glass furnace emission control system at a total cost of $280,200. The system is being purchased and installed by the debtors at the Fibers' facility to remedy the debtors' continuing violation of certain New York State stack emission requirements as found by an order entered by the New York State Department of Environmental Conservation on October 18, 1985. The debtors have been threatened with a shutdown of the Fibers' facility unless the stack emissions are brought into compliance with federal and state law. Testimony in the record supports the debtors' position that an unplanned shutdown could potentially do considerable damage to the furnace and provide some difficulty in starting back up which, the debtors argue, would effectively terminate their reorganization efforts.

Exhibit "E" is a sheet of paper captioned: "Expenses to Prevent Furnace Shut-Down Oct 1984—Dec 1985." It contains three line items:

| | |
|---|---|
| Repair Materials | 136,693.45 |
| Bushing Costs | 138,794.75 |
| Furnace Refractory Repairs | 6,789.79 |
| | 232,277.99 |

Exhibit "F" consisting of a ledger sheet entitled "1985 Repairs" and three invoices provides the backup for the line item, "Repair Materials." The attached invoices total $11,300. Thompson, who supervised the preparation of the exhibit testified that upon his instructions only invoices in excess of $5,000 were pulled. Apparently, the difference between $11,300 and the $136,693.45 cost figure for which reimbursement is sought is represented by invoices in amounts less than $5,000 which remain in the corporate offices but are not included in the present record.

Exhibit "G" corresponding to line item 2 for bushing costs consists of a single ledger sheet and attachments documenting $79,310 of the $138,794.75 expenditures claimed. There is no documentation evidencing the furnace refractory repair expense. It is Thompson's testimony that all of the foregoing expenditures were necessary to prevent a shut-down of the Fibers' furnace.

Payment of administrative expenses are ordinarily the responsibility of the debtor's estate and not chargeable to the secured creditors. *General Electric Credit Corp. v. Levin & Weintraub, (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 76 (2d Cir.1984). However, if expenses for the preservation of property can be shown to have been incurred primarily to benefit a creditor holding a security interest in the property, and did so benefit the creditor then such expenses as are found to be necessary and reasonable may be charged to the secured creditor under Code § 506(c). The debtors bear the burden of proving that the Code § 506(c) exception is

applicable. *Id.; Brookfield Production Credit Ass'n v. Borron,* 738 F.2d 951, 952 (8th Cir.1984). Proof of direct benefit is required and an applicant's burden under Code § 506(c) is not met by suggesting possible or hypothetical benefits. *General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.),* 762 F.2d 10, 12 (2d Cir.1985).

The debtors argue that the expenses in the instant case were necessary to prevent a shutdown of operations and that the expenditures preserved and enhanced the value of Dollar's collateral.

■ There is no showing on the present record that the collateral has any greater residual value as a result of the alleged expenditures or that Dollar has directly benefited therefrom. In the event that Dollar proceeds with its foreclosure, the record is devoid of proof that the new emission control system specifically designed for the Fibers' facility would have any value if dismantled and liquidated. Nor does the debtors' argument that its continued operations serves to preserve the going concern value of the collateral and thereby benefits Dollar satisfy the enunciated test of "primary" and "direct" benefit under Code § 506(c).

The Chapter 11 proceedings were undoubtedly initiated with the hope and expectation of effectuating the debtors' reorganization. Dollar is not realizing any present benefit from the continued operations of the debtor because its lien does not extend to revenue generated by the business or to other working capital. It is the debtor and other general creditors who are the primary beneficiaries of the debtors' continued operation during the pendency of the Chapter 11 proceedings. While Dollar might certainly indirectly stand to benefit should the reorganization efforts prove successful and the going concern value of its collateral be ultimately realized, the "benefit" to be realized at some point in the future is too uncertain and speculative at this time to warrant recovery of costs under Code § 506(c). *Brookfield Production Credit Ass'n v. Borron,* 36 B.R. 445, 448 (E.D.Mo.1983), *aff'd.* 738 F.2d 951 (8th Cir.1984).

Under the terms of the parties' security agreement, the debtors were obligated to keep the collateral in good order and repair. The debtors were given the right at any time to alter, add to, repair or replace any part of the collateral, providing that they did not reduce the fair market value thereof. While the agreement is silent as to who pays the costs therefor, it is presumably the debtors' burden since they have the unfettered discretion and decision in the matter. The preservation expenses which the debtors undertook to assume under their contract should not now be denominated as a "benefit" and shifted to Dollar merely because of the filing of the Chapter 11 proceeding. There is no basis in the record to infer that Dollar consented to pay the costs incurred so as to alter the terms of its contract.

Finally, the Court is unable to conclude from the record that the expenditures were reasonable and necessary to preserve Dollar's collateral. Robert Thompson testified that in addition to the costs for which recovery is presently sought the debtor anticipates continued expenditures of a significant nature that will be required regarding furnace, bushings and stackhouse emissions. The debtor is not under an obligation to continue operations in order to protect Dollar's interest in its collateral. In this sense, the expenditures cannot be deemed to be "necessary." *Matter of Combined Crofts Corp.,* 54 B.R. 294, 298 (Bankr.W.D.Wisc.1985).

The Court concludes that the debtors have not met their burden of proof under Code § 506(c) and their request for recovery is, accordingly, denied. Denial of the present request for Code § 506(c) recovery of costs is without prejudice to the debtors making an application at a later point in time upon their then ability to demonstrate that certain of the within covered expenses did in fact confer a tangible direct benefit upon Dollar.

It is so ORDERED.