In re LETTICK TYPOGRAFIC, INC., Debtor.

Bankruptcy No. 5–88–00235.

United States Bankruptcy Court, Connecticut.

July 20, 1989.

Ira B. Charmoy, Charmoy & Kanasky, Bridgeport, Conn., for debtor.

Michael T. Sage, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Connecticut Nat. Bank.

Eric J. Small, New Haven, Conn., Office of the U.S. Trustee.

## MEMORANDUM AND DECISION

ALAN H.W. SHIFF, Bankruptcy Judge.

The debtor seeks an order confirming its Third Amended Plan of Reorganization. Although no party in interest has objected, 11 U.S.C. § 1128(b), and the Office of the United States Trustee has filed no comment suggesting that confirmation should be denied, 28 U.S.C. § 586(a)(3)(B), for the reasons that follow I conclude that the debtor has failed to meet its burden of proving that its plan is confirmable. *In re Texaco Inc.*, 84 B.R. 889, 891 (Bankr.S.D.N.Y.1988) ("Even in the absence of an objection to confirmation by a party in interest, the debtor has the burden of establishing all of the requirements for confirmation delineated under 11 U.S.C. § 1129.").

## BACKGROUND

On March 21, 1988, the debtor, which is in the typesetting business, filed a petition under chapter 11 of the Bankruptcy Code. The debtor filed a Second Amended Plan on April 18, 1989, and a Third Amended Plan

1. The debtor's sole shareholder, Roger Wright, is also the sole shareholder of TEL.

(the "Plan") on April 19. The Plan lists the following classes:

### Secured Claims

Class 1 is the secured claim of North American Bank & Trust Co., estimated at $21,859.00;

Class 2 is the secured claim of Vendor Funding Co., Inc., estimated at $24,679.72;

Class 3 is the secured claim of Connecticut National Bank ("CNB"), estimated at $27,957.68;

Class 4 is the secured claim of Capital Impact Corporation, estimated at $598,058.00;

Class 5 is the secured claim of Linotype Co., estimated at $13,227.27;

Class 6 is the secured claim of GMAC, estimated at $48,972.66;

Class 7 is the disputed secured claim of Graphics/Firestone Leasing Co., for an unspecified amount;

Class 8 is the secured claim of Midlantic Commercial Leasing Corp., estimated at $6,745.75;

Class 9 is the disputed secured claim of Systems Leasing, for an unspecified amount,

Class 10 is the "secured" claim of Technical Equipment Leasing ("TEL"), "which has been deemed unsecured by agreement of the parties", *Third Amended Plan of Reorganization, Article Two, ¶ 11, at 3*, estimated at $125,350.00; [1]

Class 11 is the disputed secured claim of the State of Connecticut Department of Revenue Services, estimated at $922.82;

Class 12 is the secured claim of Pitney Bowes, for an unspecified amount.

With the exception of the claim of CNB (class 3), all other undisputed secured claims are to be paid on the effective date of the Plan. CNB's claim had been accorded that treatment under the Second Amended Plan, but just prior to the confirmation hearing the debtor filed the Plan, which technically impairs CNB's claim by deferring payment for fifteen days.[2] *See*

2. Code § 1124 provides in part:

*infra* at 38–40. While the amount of the claims of Graphics/Firestone Leasing Co. and Systems Leasing are listed as "unknown", testimony at the confirmation hearing demonstrated that they may total as much as $60,000.00.

### Unsecured Claims—Priority

Priority claims, which are listed but unclassified under the Plan, are treated as follows. Administrative expenses totalling $142,000.00, including $95,000.00 in post-petition taxes, are to be paid in full on the effective date of the plan. 11 U.S.C. § 1129(a)(9)(A). Other priority claims, consisting for the most part of pre-petition federal, state, and municipal taxes, totalling approximately $300,000.00, are to be paid within six years of the date of assessment, commencing thirty days after the effective date of the Plan with interest as provided by 28 U.S.C. § 196(a). *See* 11 U.S.C. § 1129(a)(9)(C). It is noted that the Internal Revenue Service has an unsecured general claim for $47,125.15 which the Plan appears to treat as a priority claim. *See infra* at 37–8.

### Unsecured Claims—General

Class 13 consists of allowed, unsecured claims. There are sixty-eight creditors in this class with claims totaling approximately $455,000.00. The Plan proposes to pay Class 13 creditors a pro rata share of $5,000.00, or about one percent of their claims. Class 13 has rejected the Plan.

### Interest of Shareholder

Class 14 consists of the debtor's sole shareholder, Roger Wright. The Plan proposes that on the effective date, all shares of stock will be cancelled, and 1,000 new shares will be issued to Wright, who will thereby retain a 100% ownership interest. The debtor contends that Wright will pay $339,350.00 for that interest as follows: (1) $95,000.00 in cash; (2) a $125,350.00 claim of TEL (class 10), which is wholly owned by Wright, will be forgiven; and (3) Capital Impact Corporation (class 4) will be direct-

ed by Wright to pay $119,000.00 to the IRS in satisfaction of administrative claims. *See infra* at 37.

### DISCUSSION

#### A.

Cramdown of impaired class of nonconsenting unsecured claims under § 1129(b)(2)(B)(ii)

Code § 1129(a) provides in part:

The court shall confirm a plan only if all of the following requirements are met:

. . . .

(8) with respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

Code § 1129(b) provides for the confirmation of a plan notwithstanding the requirements of paragraph (8):

(1) ... [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

. . . .

(B) With respect to a class of unsecured claims—

. . . .

(ii) the holder of any claim or interest that is junior to the claims of such

---

[A] class of claims or interests is impaired under a plan unless ... the plan—

. . . .

(3) provides that, on the effective date of the plan, the holder of such claim or interest

receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim....

class will not receive or retain under the plan on account of such junior claim or interest any property.

In arguing that its plan is confirmable notwithstanding § 1129(b)(2)(B)(ii), the debtor relies upon *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), which recognized an exception to the absolute priority rule. The absolute priority rule is now codified as § 1129(b)(2)(B)(ii). H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 413 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Under the *Los Angeles Lumber* exception, holders of equity security could "make a fresh contribution and receive in return a participation reasonably equivalent to their contribution...." *Los Angeles Lumber, supra,* 308 U.S. at 121, 60 S.Ct. at 10. *See also Official Creditors' Comm. v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.),* 781 F.2d 99, 101 (7th Cir.1986) ("The new capital investment must ... equal or exceed the value of the retained interest in the corporation."); *In re Future Energy Corp.,* 83 B.R. 470, 499 (Bankr.S.D.Ohio 1988) (new investment must equal or exceed retained interest). Moreover, under that exception, the investment must be "money or money's worth", that is, something tangible, alienable and leviable. *See Los Angeles Lumber, supra,* 308 U.S. at 122, 60 S.Ct. at 10–11; *Matter of Stegall,* 865 F.2d 140, 142 (7th Cir.1989).

The continued vitality of the *Los Angeles Lumber* exception was questioned but not decided by the Supreme Court in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), because the Court concluded that even if the exception were viable after the enactment of the Bankruptcy Reform Act of 1978, the debtor's plan failed to meet its requirements. For the same reason, it is not necessary to consider that question here.

In an attempt to satisfy the *Los Angeles Lumber* test, the debtor offered evidence that its present value as a going concern is $196,940.00, as compared to Wright's alleged $339,350.00 capital investment. Both figures are grossly inaccurate.

(1)

### Value of the Reorganized Debtor

The debtor offered the testimony of its accountant, who claimed to use a "yield capitalization" or "discounted value" formula[3] to compute the going concern value of the reorganized debtor. I find, however, that although that formula is acceptable, albeit somewhat cumbersome, *see infra* at 37, the accountant did not properly apply it. As a consequence, the present value of the debtor's business as a going concern was substantially understated.

(a)

### Discount Rate

In calculating the discount rate, or weighted cost of capital, *see supra* note 3, the accountant assumed that the total debt was $1,669,637.00, the cost of debt was approximately 8%, the total equity contri-

---

**3.** Under that method:

(a) the appropriate discount rate ("r") is established, in this case by the debtor computing its weighted cost of capital as follows:

weighted cost of capital =

weighted cost of debt + weighted cost of equity =

proportion of debt to capital × cost of debt + proportion of equity to capital × cost of equity

(b) the discount rate is then used to determine the present value of future operating income as follows:

(i) the present value of operating income ("OI") for an arbitrary time period, in this case five years, is determined as follows:

$$\frac{OI_1}{(1+r)} + \frac{OI_2}{(1+r)^2} + \frac{OI_3}{(1+r)^3} + \frac{OI_4}{(1+r)^4} + \frac{OI_5}{(1+r)^5}$$

(ii) the residual value ("RV"), that is the present value of operating income for all years following the final known year, is determined by using the final year's operating income, in this case the fifth year's, as follows:

$$\frac{OI_5}{r} = OI_n$$

$$\frac{OI_n}{(1+r)^5} = RV$$

(iii) the present value of operating income for each of the five years and the residual value are added, producing the present value of the going concern.

bution was $214,000.00, and the expected rate of return on equity was 20%. From those numbers he arrived at a discount rate of 10.446%. That rate is skewed, however, by the incorrect numbers used in computing both the weighted cost of the reorganized debt and the weighted cost of equity components of the discount rate calculation. *See supra* note 3.

No allowance was made for the disputed claims of Graphics/Firestone and Systems Leasing. More important, the $455,000.00 Class 13 unsecured debt and the $123,-350.00 claim of TEL, which are not a part of the debt to be administered by the Plan, are included in the total debt calculated by the accountant, notwithstanding the clear indication in *In re Fiberglass Industries, Inc.*, 74 B.R. 738, 746 (Bankr.N.D.N.Y. 1987), relied upon by the debtor, that the reorganized debtor's post-confirmation debt should be used in the calculation. As a result of that error, the total post-confirmation debt is overstated by at least $525,-000.00, thereby distorting the proportion of debt to capital calculation. *See supra* note 3. The accountant also failed to make any allowance for the cost of approximately $80,000.00 owed in tax claims, which are to be paid over time, in figuring the cost of debt. *See supra* note 3.[4]

In computing the proportion of equity to capital, *see supra* note 3, the accountant used $214,000.00 as the total equity contribution, although the debtor claims that Wright will pay $339,000.00 under the Plan to retain his 100% equity interest. This obvious contradiction was not explained. Moreover, the accountant used a 20% expected rate of return on equity, that is, the cost of equity. *See supra* note 3. Although projections necessarily depend upon assumptions, experts are expected to offer the basis upon which their assumptions are made. No testimony was elicited that the debtor's accountant has any expertise with respect to the risk involved with this business, the typesetting industry in general, or the rate of return generally expected by investors from comparable investment opportunities. Without such evidence there is no basis to conclude that the 20% rate of return is anything more than an arbitrary guess.

(b)

Methodology

A more fundamental defect in the debtor's analysis is the lack of a "residual value" calculation. *See supra* note 3, ¶ (b)(ii), (iii). The accountant discounted projected operating income to present value for a five year period,[5] but although it is doubtful that the accountant assumed that the debtor's reorganized business would terminate at the end of that period, he went no further in his calculations. Without calculating the present value of operating income for future years after the fifth year, the computed present value is grossly inaccurate. *In re Fiberglass Indus., Inc., supra*, 74 B.R. at 743 (it is necessary to discount to present value operating income for given years "and for a terminal year which represents a normalized projection for all years" which follow the last given year in a discounted operating income analysis). *See also The Matter of Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, 531 F.Supp. 1191, 1226 (Regional Rail Reorg.Ct.1981) ("Of course, the ... witness did not assume that an enterprise would disappear at the end of twenty years.... The total value of the enterprise is equal to the [present discounted value] of the annual cash flow projections plus the [present discounted value] of the terminal value.").

4. The overstatement of the debt and the failure to include the cost of the $80,000 in taxes to be paid over time produces a bizarre and glaringly inaccurate result. While the interest rates used by the debtor in its calculations are 13% and 9%, and none of the reorganized debt is to be interest free, the debtor calculates that its average post-confirmation interest rate, or cost of debt, will be only 8%.

5. The debtor estimates its operating income for the years 1990–1994 as follows:

| | |
|---|---|
| 1990 | $53,141 |
| 1991 | $53,231 |
| 1992 | $55,890 |
| 1993 | $46,898 |
| 1994 | $49,280 |

The court in *Matter of Valuation Proceedings* explained a method for calculating the residual value of an enterprise at the end of a given period:

> To calculate terminal value one divides the normalized year's earnings by the appropriate discount rate—exactly the same as the calculation of capitalized earnings value.... Next, one calculates the [present discounted value] of the terminal value....

*Matter of Valuation Proceedings, supra,* 531 F.Supp. at 1226 n. 55. The "normalized year", which represents the expected income for future years, is assumed to be the final given year's income. *See id.* at 1226. Under that method, if it is assumed that the debtor's $49,280.00 estimated operating income for 1994 represents a "normalized year" and that the 10.446% discount rate used by the debtor were accurate, this final calculation would add $287,-058.76 to the value of the debtor, bringing its total value to approximately $483,-998.76.[6]

This finding is supported by using the "direct capitalization" or "capitalized earnings" method of determining value. Under that method, an estimate of a single year's income or an estimate of average income for a period of time is divided by the appropriate rate. *Id.* at 1225 n. 52; *In re Jartran,* 44 B.R. 331, 372–73 n. 84 (Bankr.N.D. Ill.1984); Judge D. Houston & Judge J. Queenan, *Valuation in Bankruptcy Proceedings* 27–30 (Paper delivered at April 13–15, 1988, Boston seminar for Bankruptcy Judges). When the average of the reorganized debtor's five year expected operating income, $51,688.00, is divided by the 10.446% discount rate used by the debtor, a value of $494,811.41 is computed. It is therefore apparent that even if the discount rate used by the debtor were accurate, the value of the reorganized debtor would be approximately $490,000.00. The $196,940.00 value calculated by the debtor's accountant is thus undoubtedly the result of his seriously flawed methodology.

**6.** The calculation is as follows:

(1) $\underline{OI_5} = \underline{49,280.00} = \$471,759.52$
$.10446$

(2)

### Wright's Contribution

In addition to understating its value, the debtor also grossly overstated the contribution to be made by Wright. The $119,-000.00 which Wright is to "direct" Capital Impact Corporation to pay to the IRS constitutes no contribution. That money was withheld by Capital Impact when it loaned the debtor $598,058.00. Although the debtor now contends that that money was borrowed by Wright and the debtor, the loan is treated in the Disclosure Statement and Plan as an obligation of the debtor alone. Even if Wright is acting as agent of the debtor, that is not the equivalent of Wright paying $119,000.00. Any payment by Capital Impact to the IRS would merely substitute that company for the IRS as a creditor to the extent of the payment. The Plan does not state that Wright will pay the debtor's increased obligation to Capital Impact.

It also is apparent that waiving TEL's "secured" claim for $125,350.00 does not constitute a contribution by Wright. The simple fact is that that claim is unsecured, that unsecured claims are treated in Class 13 by payment of a pro rata share of $5,000.00, and that the waiver of that claim does not reduce the debtor's obligation to that class.

I conclude that Wright's $95,000.00 cash contribution stands alone, so that even if the debtor's going concern valuation of $196,940.00 were accepted as accurate, Wright's capital investment would fall far short of the *Los Angeles Lumber* exception to the absolute priority rule.

### B.

### §§ 1129(a)(1), 1122(a)

Section 1129(a) provides in part:

> The court shall confirm a plan only if all of the following requirements are met:

(2) $\dfrac{471,759.52}{(1 + .10446)^5} = \$287,058.76$

(3) $287,058.76 + 196,940.00 = 483,998.76$

(1) The plan complies with the applicable provisions of this title.

The plan must therefore comply with § 1122, which in relevant part provides:

(a) ... [A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

While § 1122(a) does not prohibit placing substantially similar claims in different classes, the debtor's discretion to do so is not unlimited, and such separate classifications must be reasonable. *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987); *Matter of Jersey Medical Center,* 817 F.2d 1055, 1061 (3rd Cir.1987); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.),* 800 F.2d 581, 586–87 (6th Cir.1986). Classes must be carefully scrutinized to prevent manipulative classifications from eroding the Bankruptcy Code goal of according similar treatment to similar claims. *See Hanson, supra,* 828 F.2d at 1313; *In re Northeast Dairy Coop. Fed'n, Inc.,* 73 B.R. 239, 250 (Bankr.N.D.N.Y.1987); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 831 (Bankr.S.D.N.Y.1982).

■ As noted, although the unsecured, non-priority claim of the IRS is not included in the unsecured creditors' Class 13 or otherwise classified, the debtor proposes to pay that claim in full. *See supra* at 34. Further, the debtor has classified the unsecured claim of TEL as a secured claim. The debtor has presented no acceptable justification for those classifications. To the contrary, it is apparent the debtor did not include the IRS claim in Class 13 in order to avoid IRS opposition to the Plan

and that the purpose of the TEL treatment was to inflate the amount of Wright's capital investment under the *Los Angeles Lumber* analysis. These classifications attempt to improperly manipulate the unsecured creditor class, neutralize objections to confirmation, 11 U.S.C. § 1128(b), and cram down unsecured creditors, 11 U.S.C. § 1129(b)(2)(B)(ii), and are accordingly unreasonable under § 1122(a).

### C.
### § 1129(a)(10)

Code § 1129(a) provides:

The court shall confirm a plan only if all of the following requirements are met:

. . . .

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

The purpose of § 1129(a)(10) is to provide some indicia of support by affected creditors and prevent confirmation where such support is lacking. *See In re Polytherm Indus., Inc.,* 33 B.R. 823, 835 (W.D.Wisc. 1983); *In re Barrington Oaks General Partnership,* 15 B.R. 952, 970 (Bankr.D. Utah 1981).

■ Class 13, as noted, is impaired and has rejected the plan. TEL is impaired and has accepted the Plan, but since it is an insider, its acceptance does not satisfy (a)(10).[7] In a transparent attempt to stage compliance with (a)(10), the debtor created an artificially impaired class by amending its Second Plan so that CNB is to be paid two weeks after the effective date of the

---

7. Code § 101(30) provides that " 'insider' includes ... (E) affiliate, or insider of an affiliate as if such affiliate were the debtor ...." Code § 101(2) provides:

"affiliate" means—

. . . .

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent

or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote

. . . .

As noted, both the debtor and TEL are wholly owned by Wright, so that they are "affiliates", and TEL is an "insider".

Plan. While the debtor may have achieved literal compliance with § 1129(a)(10), this engineered impairment so distorts the meaning and purpose of that subsection that to permit it would reduce (a)(10) to a nullity. *See In re Polytherm Indus., Inc., supra,* 33 B.R. at 836 ("Certainly, acceptance of a plan by a slightly impaired class would contribute very little to an indicia of creditor support for the plan.").

### CONCLUSION

The debtor has failed to satisfy § 1129(a)(1), (8), (10), confirmation of the Plan is denied, and IT IS SO ORDERED.