**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: ROBERT H. SCHWARZMANN;
LEONA M. SCHWARZMANN,
<u>Debtors.</u>

ROBERT H. SCHWARZMANN; LEONA M.
SCHWARZMANN,                                                    No. 95-2512
<u>Plaintiffs-Appellees,</u>

v.

FIRST UNION NATIONAL BANK OF
VIRGINIA,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-95-604-A, BK-93-15307-AT)

Argued: September 25, 1996

Decided: December 6, 1996

Before LUTTIG and MICHAEL, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Simson Musgrave, PIPER & MARBURY, L.L.P.,
Baltimore, Maryland, for Appellant. Steven Brett Ramsdell, TYLER,

BARTL, BURKE & ALBERT, P.L.C., Alexandria, Virginia, for Appellees. **ON BRIEF:** Robert O. Tyler, Richard A. Bartl, TYLER, BARTL, BURKE & ALBERT, P.L.C., Alexandria, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

First Union National Bank of Virginia ("First Union") appeals from a district court order affirming the bankruptcy court's confirmation of the debtors' Chapter 11 plan as modified. First Union contends that the debtors' plan violates several requirements of § 1129 of the Bankruptcy Code and therefore should not have been confirmed. Finding no error, we affirm.

I.

The chapter 11 debtors here, Robert H. and Leona M. Schwarzmann, own and operate A-Abart Enterprises, Inc. ("A-Abart"), which uses the trade name of A & R Tool Rental. A-Abart is in the business of equipment rental, serving primarily the construction industry. It conducts its business from several commercial properties owned by the debtors, including properties located at (1) 8231-35 Lee Highway, Merrifield, Virginia ("Merrifield property"), (2) 43925 Lee Jackson Highway, Chantilly, Virginia ("Chantilly property"), and (3) 9029 Euclid Avenue, Manassas, Virginia ("Manassas property"). The debtors also own commercial property at 2754 Gallows Road, Vienna, Virginia ("Vienna property"), which is rented by Tyson's Ford, Inc.

Creditor First Union, a successor in interest, held the debtors' note in the amount of $4,700,000, dated January 4, 1990. The note was secured by first deeds of trust against the Merrifield, Manassas,

2

and Vienna properties. The note required the debtors to make a $2,000,000 curtailment payment prior to January 4, 1991, but this payment was not made. Thereafter, the note was restructured through an allonge to deed of trust notes, which required either (a) a $1,000,000 curtailment by January 2, 1992, and a $1,125,000 curtailment by June 30, 1992, or (b) a $2,250,000 curtailment by June 30, 1992. In the restructuring First Union also acquired a first deed of trust on the Chantilly property, a second deed of trust on the debtors' residence, and a junior lien on the assets of A-Abart, which included equipment and municipal bonds.

After the debtors once again failed to make the required curtailment payments, the parties entered into a forbearance agreement under which First Union agreed not to take legal action to collect the debt until May 1, 1993. When May 1, 1993, passed without any resolution of the default, First Union scheduled a foreclosure sale for the Vienna property on December 28, 1993. The debtors filed a voluntary chapter 11 petition the day before the sale, which stayed the foreclosure.

Both the debtors and First Union filed plans of reorganization. The debtors' plan divided creditors into four classes. Class I consisted of First Union's claim. The debtors proposed to continue monthly interest payments to First Union at the contract rate, to make a $1,000,000 curtailment within one year (which would release the lien on A-Abart's equipment), and to pay the balance of the First Union claim within two years.[1] If the debtors failed to make any of these payments, First Union could pursue its original remedies under the loan documents. Classes II through IV consisted of ten other secured and unsecured creditors. The debtors proposed that the prepetition rights of the secured creditors in Classes II and IV be altered (impaired) as follows: first, these creditors would have to seek bankruptcy court approval before undertaking collection activity; and second, one Class II creditor (the Child Development Center ("CDC")), whose $82,731

_____

[1] The debtors planned to generate the cash to pay First Union through sale of the Vienna property and through refinancing of the debt.

3

loan had matured prepetition, would be required to accept repayment at the rate set forth in the debtors' cash flow projection.[2]

First Union argued that the debtors' plan was not feasible because history showed that the debtors had been unable either to secure refinancing or to sell their properties. According to First Union the debtors' plan had no definitive proposals that would make the future any different, so it was simply an involuntary two-year forbearance. First Union also argued that it was the only truly impaired class, and its failure to approve the plan prevented an involuntary "cram-down" under 11 U.S.C. § 1129(a)(10).

First Union's plan allowed for twelve classes of creditors. First Union was by itself in the only impaired class in its plan. The loan from First Union, which matured prepetition, would be paid off in eighteen months, six months sooner than under the debtors' plan. The First Union plan required the expeditious sale of the debtors' real estate: the four commercial properties (including those where the debtors operated their business) were to be sold within a year, and the residence was to be sold within eighteen months. The plan gave First Union's lawyer the authority to sell the properties and to determine the order of sales. The debtors were given the right to object to sales, and First Union could not foreclose as long as the property sales (and payments to First Union) were made by the times specified in the plan.

_____

**2** Article III, § 3.2 of the debtors' plan states that all secured claims other than First Union's "will be paid in full in accordance with the terms of existing loan documents, or such other terms as may be agreed to between the holder(s) and the Debtors." According to testimony by debtor Mr. Schwarzmann, CDC said orally that it was "very happy to accept [the debtors'] payment the way [they had] been making it for the past number of years." However, the loan documents were never modified to allow for any reamortization. Article IV, § 4.1 of the debtors' plan states that the plan shall be implemented "in accordance with its terms and by payments made on or before the dates shown in the cash flow projection attached as <u>Exhibit 4</u>." These cash flow projections show that the CDC loan would not be paid according to its written terms, but instead was reamortized.

The debtors objected to First Union's plan, pointing out that the plan would deprive them of the premises from which they ran their business. In particular, the debtors argued that the extensive liquidation proposed by First Union would rule out any opportunity to refinance or to pay ongoing business expenses. If First Union's counsel chose to sell the Merrifield property first, the debtors predicted that this would generate large capital gains tax liabilities that could only be paid by further liquidation of property.

All creditors besides First Union approved the debtors' plan. Despite First Union's objections, the bankruptcy court confirmed the debtors' plan. However, it found that the requirement of court approval for lien enforcement was an attempt to impair a class artificially. The court therefore struck this requirement. The court did find, however, that CDC was impaired because it had to accept a delayed loan amortization. The court then modified Article III of the debtors' plan to create a Class II(B), which contained only CDC. Because CDC had voted in favor of the debtors' plan, the plan qualified under § 1129(a)(10), that is, an impaired class had accepted the plan. The court found that the $4.6 million debt to First Union was secured by property worth $7 million.[3] Finding that the debtors' plan was feasible, fair, and equitable, the bankruptcy court confirmed it as modified.

First Union appealed (to the district court) the bankruptcy court's order that confirmed the debtors' plan. The district court affirmed, and First Union now appeals to us.

_____

[3] The bankruptcy court valued the individual items of collateral as follows:

| | | |
|---|---|---|
| 1. | Merrifield Property | $2,100,000.00 |
| 2. | Vienna Property | $927,000.00 |
| 3. | Manassas Property | $936,000.00 |
| 4. | Chantilly Property | $900,000.00 |
| 5. | Debtors' Residence (net of first deed of trust) | $548,000.00 |
| 6. | Municipal Bonds | $82,000.00 |
| 7. | A-Abart Equipment (net of purchase money financing) | $1,600,000.00 |
| | TOTAL | $7,093,000.00 |

5

II.

Section 1129 of the Bankruptcy Code (11 U.S.C. § 1129) contains the requirements for court confirmation of a chapter 11 reorganization plan. According to First Union, the debtors' plan does not meet the requirements contained in the following statutory provisions: § 1129(a)(10), which requires at least one impaired class to accept the plan; § 1129(a)(11), which requires that the plan be feasible; § 1123(a)(5), which requires that the plan have an adequate means of implementation;[4] § 1129(a)(3), which requires the plan to be proposed in good faith; and § 1129(b), which requires the plan to be fair and equitable.

A.

We turn first to First Union's argument under § 1129(a)(10), which requires that one class of impaired claims vote for the debtors' plan. In particular, First Union argues that CDC, the only creditor in Class II(B), was not truly impaired and its vote in favor of the plan does not satisfy § 1129(a)(10).

The general rule under 11 U.S.C. § 1129(a)(8) requires all classes impaired under a chapter 11 plan to approve of the plan for it to be confirmed. However, this requirement may be avoided through a process known as "cram-down." According to § 1129(b)(1) the requirements of § 1129(a)(8) need not be met if the plan "does not discriminate unfairly, and is fair and equitable" to those classes not accepting the plan. However, the requirements of § 1129(a)(10) must still be met. Under § 1129(a)(10) at least one impaired class must accept the plan.

A claim is not impaired by a plan if the plan "leaves unaltered the legal, equitable, and contractual rights to which such a claim or interest entitles the holder of such claim or interest" or if the plan cures or compensates for past default. 11 U.S.C. § 1124. It is "well established" that § 1124 defines impairment in very broad terms. L & J

_____

[4] Although § 1123(a)(5) is not part of § 1129, § 1129(a)(1) requires plans to comply with all applicable provisions of the title.

6

Anaheim Assoc. v. Kawasaki Leasing Int'l, Inc., 995 F.2d 940, 942 (9th Cir. 1993).

Despite the broad language of § 1124, some courts do not allow debtors to "artificially impair" classes in order to circumvent the requirements of § 1129(a)(10). See, e.g., In re Lettick Typografic, Inc., 103 B.R. 32, 38-39 (Bankr. D. Conn. 1989). Artificial impairment occurs when a plan imposes an insignificant impairment on a certain class of creditors in order to qualify them as impaired under § 1124. Presumably these creditors then approve the plan over the objections of truly impaired creditors. The artificially impaired creditors are often trade creditors who wish the debtor to remain in business; truly impaired creditors, on the other hand, are often lenders seeking to foreclose on a debtor's property. According to one court, a plan approved only by artificially impaired creditors can act as an "alternative to refinancing," and section 1129(a)(10) then becomes a "mechanism by which [debtors] might draft their own loans from existing lenders." Windsor on the River Assoc., Ltd. v. Balcor Real Estate Fin., Inc., 7 F.3d 127, 132 (8th Cir. 1993). However, not all courts recognize the concept of artificial impairment. See, e.g., L & J Anaheim Assoc., 995 F.2d at 943 (holding that§ 1124 does not differentiate between artificial and actual impairments).

We need not decide whether the vote of an artificially impaired class to accept a plan counts under § 1129(a)(10) because the impairment to CDC's claim is not artificial or insignificant. CDC has a valid claim that came due prior to the bankruptcy proceedings. The CDC loan was in default, and the debtors' plan established a repayment schedule that did not immediately resolve the default and required CDC to defer pursuit of its legal remedies. First Union argues that this is not an impairment because CDC had agreed to late payment before the plan was approved. Debtor Mr. Schwarzmann did testify that CDC had "orally agreed" to accept payment the way the debtors had "been making it." But Mr. Schwarzmann acknowledged that the CDC loan had matured and that the informal extension was simply carried out on a "very friendly basis." Indeed, there was no amendment to the loan documents, and the bankruptcy court found as a matter of fact that CDC's "loan had matured preconfirmation." This finding was not clearly erroneous. Thus, the plan's requirement that CDC accept loan reamortization was an alteration of CDC's legal and contractual pre-

7

petition rights, making CDC an impaired creditor. Both the bankruptcy and district courts were correct to conclude that the requirements of § 1129(a)(10) were met because CDC, an impaired creditor class, voted in favor of the plan.

B.

We take up First Union's remaining § 1129 arguments together. First Union claims that the debtors' plan violates § 1129(a)(11) because the plan is "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor," which makes the plan not feasible. Additionally, First Union claims that the plan violates § 1123(a)(5) (and therefore § 1129(a)(1)) because it does not "provide adequate means for [its] implementation." The plan's failure to provide such means, according to First Union, also violates the good faith requirement of § 1129(a)(3). Finally, First Union contends that the debtors' plan violated § 1129(b)(1)'s requirement that a plan crammed down over the objections of some creditors be "fair and equitable" to those objecting creditors.

These alleged violations all center around the same core contention. First Union alleges that the debtors' plan is not a realistic one, because debtors failed in their previous attempts to sell property or obtain refinancing. First Union says the wide discretion given to the debtors in managing their property will be fatal to the plan, turning it into a two-year court-ordered forbearance.

As First Union recognizes, however, the factual findings of the bankruptcy court are subject to a "clearly erroneous" standard of review. See Green v. Staples, 934 F.2d 568, 570 (4th Cir. 1991). The bankruptcy court found the plan to be feasible, to have an adequate means of implementation, and to be fair and equitable. These findings are amply supported by the record. As the district court pointed out, "First Union's plan for reorganization could conceivably result in premature or unnecessary forced sales of debtors' assets which could jeopardize the continuation of debtors' business." On the other hand, the debtors' plan provided for "full payment to First Union only six months later than under the First Union plan," and "First Union's claim is amply secured if not oversecured and will remain so under the debtors' plan." As noted earlier, First Union's $4,700,000 note

8

was secured by property worth $7,093,000.**5**  Additionally, First Union can pursue its foreclosure remedies if the interest or curtailment payments are not made. Under these circumstances, we cannot say that the bankruptcy court erred in confirming the debtors' plan.

III.

Because the debtors' plan met the requirements of § 1129, the bankruptcy court did not err in entering an order confirming that plan. We therefore affirm the district court's order affirming the bankruptcy court's confirmation order.

AFFIRMED

_____

**5** In September 1995, seven months after confirmation of the plan, the debtors made a curtailment payment of $1,100,000 to First Union, and First Union released its lien on the assets of A-Abart.

9