**In re Michael A. GIBBS, and Giselle Gibbs, Debtors.**

**Bankruptcy No. 95–50902.**

United States Bankruptcy Court,
D. Connecticut.

Mar. 12, 1999.

---

Douglas Tabachnik, New York City, for debtors.

Richard M. Zaroff, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York City, for debtors.

William Rossi–Hawkins, Philips, Lytle, Hitchcock, Blaine & Huber, LLP, New York City, for Marine Midland Bank.

David A. Ball, Cohen and Wolf, Bridgeport, CT, for Marine Midland Bank.

## MEMORANDUM AND ORDER DENYING CONFIRMATION

ALAN H.W. SHIFF, Chief Judge.

It was determined at an October 14, 1998 hearing that the debtors' Fifth Amended Plan of Reorganization (the "Plan") was not confirmable. This decision memorializes that ruling.

## BACKGROUND

On June 19, 1995, the debtors commenced this chapter 11 case, and on March 2, 1998, they filed their Fifth Amended Plan together with their Fourth Amended Disclosure Statement. The debtors' principal residence is located at 15 Father Peter's Lane, New Canaan, Connecticut (the "Property"). The Property is secured by three mortgages, two of which were assumed by the debtors when they purchased the Property in December 1989. The first was in the principal amount of $1,000,000 and has been assigned to the FDIC. The second was in the principal amount of $1,500,000 and it was and remains secured solely by the Property. The second mortgage has been assigned to Wilshire Credit Corp. ("Wilshire"). The third mortgage was in the principal amount of $1,800,000 in favor of Marine Midland Bank ("Marine"). The third mortgage was and remains secured by the Property and other real estate in which the debtors had an interest. A December 30, 1997 agreement between the FDIC, Wilshire, and the debtors ("subordination agreement") provided that Wilshire would have a first mortgage lien on the

Property.[1] Accordingly, the lien priorities have been realigned so that Wilshire, the FDIC, and Marine now have first, second, and third mortgages respectively.

Wilshire filed a proof of claim asserting a secured claim of $2,272,586.83 and an unsecured nonpriority claim "to the extent the collateral is insufficient." *Claim # 12.* Marine filed a proof of claim asserting a secured claim of $1,645,054.36. *Claim # 28.* The FDIC filed an amended proof of claim asserting an unsecured nonpriority claim in the amount of $1,218,957.12. *Claim # 34.* No objections have been filed to any of those proofs of claim. There is no dispute that the value of the Property, which has not been fixed, is less than the amount of Wilshire's claim.

Marine has objected to confirmation of the debtors' Plan which provides for the following classification and treatment of claims:

*Unclassified: Administrative Expense Claims:* to be paid in full on the effective date of the plan.

*Unclassified: Priority Tax Claims:* to be paid in deferred cash payments over 6 years.

*Class 1: Other Priority Claims:* to be paid in full on the effective date. There are no claims in this class.

*Class 2: Undersecured Claim of Wilshire Credit Corp.* Wilshire's total claim is $2,272,586. The amount of its claim in this class is $2,000,000 which is to be paid in full by January 1, 2003. *See Plan* at 8. The remainder of its claim is treated as an unsecured claim to be added to the claims in Class 4.

*Class 3: Unsecured Claim of FDIC* —to be paid 10% under the formula established for Class 4.

*Class 4: Other Unsecured Creditors* —to be paid 10% as follows:

(i) $133,104 is be paid to Wilshire on or before January 1, 1999 to bring debtors current under the subordination agreement—Any excess amounts provided by

1. *See Plan* at 8 and Exhibit A. The basis for the FDIC's agreement to be subordinated has not been disclosed.

the debtor's future income will be divided 60% to the debtors and 40% to creditors of Classes 3 and 4.

(ii) if creditors of Classes 3 and 4 are not paid 10% by June 3, 2001, then after first $133,104 is paid to Wilshire, any excess amounts, provided by the debtor's future income, will be divided 50% to the debtors and 50% to those classes.

(iii) to secure payments, the debtors will pledge 50,000 common shares of Compass to be held in escrow.[2]

(iv) the debtors intend to pursue an adversary proceeding against Marine and to contribute 30% of any sums recovered as an "additional dividend" to Classes 3 and 4.

## DISCUSSION

Title 11 U.S.C. § 1129(a) states that the court shall confirm a plan only if the requirements of all of the subsections are met, including the requirement that a plan comply with the applicable provisions of the bankruptcy code, *see* § 1129(a)(1). Under §§ 501 and 502, the claims of Wilshire, Marine, and the FDIC are allowed. The determination of the secured status of allowed claims is made pursuant to 11 U.S.C. § 506:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim ....

Accordingly, at this stage of the analysis, and without considering whether Wilshire's claim may be bifurcated as the Plan proposes, *see infra* n. 3, Wilshire's claim is deemed secured in part and unsecured in part because the value of the residence is less than the amount of its claim. The claims of FDIC and Marine are deemed to be allowed unsecured claim because they are wholly under-

secured. *Id.* *See also in re Hornes, infra* n. 3.

### *Proposed Funding of the Plan with Post–Petition Income*

■ The debtors propose to fund the Plan out of the debtors' future "contingent income," which the Plan generally defines as any income over Michael Gibbs' base annual income of $275,000 plus $60,000 in consulting fees. *See Plan, Article I,* ¶¶ 1.2, 1.3, *Article III,* ¶¶ (k)(1), (2), (3), (4).

That proposal appears to conflict with the analysis in *In re Flor,* 166 B.R. 512, 514 (Bankr.D.Conn.1994), *affirmed,* No. 3:94CV1130 slip op. at 3–5 (D.Conn. March 24, 1995) (Covello, J.), *appeal dismissed,* 79 F.3d 281 (2nd Cir.1996). In that case, the bankruptcy court concluded that "it is against public policy to [confirm a Chapter 11 plan] which purports to authorize and validate a voluntary assignment of an individual's future wages."

It is firmly established that estate property in Chapter 11 does not include an individual debtor's postpetition wages. Section 541(a)(6) specifically provides that

excluded from property of the estate are earnings from services performed by an individual debtor after the commencement of the case.

*Id.* at 514.

The earning power of an individual is the power to create property; but it is not translated into property within the meaning of the bankruptcy act until it has brought earnings into existence ....

. . .

When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern .... The new opportunity in life and the clear field for future effort, which it is

---

2. "Compass" refers to Compass Plastics & Technologies, Inc., where Michael Gibbs is currently employed as president and chief executive officer. *See Disclosure Statement* at 6–8.

the purpose of the bankruptcy act to afford the emancipated debtor, would be of little value to the wage earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

*Id.* (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 243–246, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

It is clear, however, that the Plan cannot be confirmed even without reliance on *Flor.*

### *Proposed Classification of the FDIC*

 Title 11 U.S.C. § 1122 provides:

Classification of claims or interests

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

A fundamental principle of classification is that similar claims must be classed together. *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir.1994) (a debtor "must adduce credible proof of a legitimate reason for separate classification of similar claims."). The same principle applies to the deficiency portion of an under-secured creditor's claim. *See In re D & W Realty,* 165 B.R. at 130 (S.D.N.Y.1994) ("separate classification of

unsecured deficiency claims and other unsecured claims ... may be permitted only for legitimate business or Code-based reasons"). *See also In Matter of 183 Lorraine Street Associates,* 198 B.R. 16, 28 (E.D.N.Y.1996).

No economic or business reason has been advanced by the debtors to justify the classification of the unsecured claim of the FDIC in a separate category from other unsecured claims, *see, e.g., Plan* at 11 and *Disclosure Statement* at 23, nor is any such justification apparent. Indeed, the debtors have conceded that the FDIC was not placed in a separate class for any economic reason but rather to satisfy the § 1129(a)(10) requirement that at least one class of impaired claims has accepted the plan. *See Tr. October 14, 1998* at 3, 5, 12–13, 21–22. The argument that the FDIC is being afforded the same *treatment* as other unsecured claimants, notwithstanding its separate classification, is unavailing. *See In re Lettick Typografic,* 103 B.R. 32, 38 (Bankr.D.Conn. 1989) ("Classes must be carefully scrutinized to prevent manipulative classifications from eroding the Bankruptcy Code goal of affording similar treatment to similar claims"). The Plan is therefore not confirmable.[3]

### ORDER

Accordingly, confirmation of the debtors' Fifth Amended Plan of Reorganization is DENIED, and it is

SO ORDERED.

---

3. Arguably, the Plan is not confirmable for the reason that it proposes to bifurcate Wilshire's claim into a secured and an unsecured claim, in violation of § 1123(b)(5)'s proscription that a chapter 11 plan may not "modify the rights of holders of secured claims ... secured only by a security interest in real estate that is the debtors' principal residence, or of holders of unsecured claims ...". That language, which was added by the 1994 amendments to the Bankruptcy Code, codified *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) and extended its application to chapter 11 cases. *Nobelman* has been clarified by *In re Hornes,* 160 B.R. 709, 711, 718–719 (Bankr. D.Conn.1993), which held that a debtor may nonetheless modify the rights of a wholly unsecured homestead mortgagee.

Wilshire is not wholly unsecured. Notwithstanding *Nobelman,* the debtors' Plan proposes to modify Wilshire's rights. The modification would put the unsecured portion of Wilshire's claim in Class 4, which would have an adverse effect on the other holders of claims in that class by reducing their distribution. That treatment would also dilute the vote of the other holders of claims in that class in the event of a cram-down. *See Tr. October 14, 1998* at 24–25. The issue of whether or not a secured creditor whose sole security is interest in the debtor's principal residence may waive the anti-modification provisions of § 1123(b)(5) to the detriment of other creditors is not reached in this decision because the Plan cannot be confirmed for the other reasons provided herein.